IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| ALASKA OIL AND GAS ASSOCIATION, *et al*., | Case No. 4:13-cv-00018-RRB |
| Plaintiffs, | |
| vs. | **MEMORANDUM DECISION** |
| PENNY PRITZKER, U.S. SECRETARY OF COMMERCE, *et al.*, | |
| Defendants. | |
| STATE OF ALASKA, | Case No. 4:13-cv-00021-RRB |
| Plaintiff, | |
| vs. | |
| NATIONAL MARINE FISHERIES SERVICE, *et al*., | |
| Defendants | |
| NORTH SLOPE BOROUGH, *et al.* | Case No. 4:13-cv-00022-RRB |
| Plaintiffs, | |
| vs. | |
| PENNY PRITZKER, *et al.,* | |
| Defendants | |

# I.    DECISION APPEALED

On December 28, 2012, the National Marine Fisheries Service ("NMFS") and National Oceanic and Atmospheric Administration ("NOAA") of the Department of Commerce issued a final decision listing the Beringia and Okhotsk distinct population segments ("DPS") of bearded seals (the *Erignathus barbatus nauticus* subspecies) as threatened under the Endangered Species Act ("ESA") (hereinafter referred to as the "Listing Rule").[1] These consolidated actions challenge that decision.[2] The facts underlying the consolidated actions are well known to parties and a matter of public record. Accordingly, the facts will not be repeated herein except to the extent necessary to understand the decision of this Court.

---

[1] *Endangered and Threatened Species; Threatened Status for the Beringia and Okhotsk Distinct Population Segments of the Erignathus barbatus nauticus Subspecies of the Bearded Seal*, 77 Fed. Reg. 76739–68 (December 28, 2012); *see* 50 C.F.R. § 223.102 *Enumeration of threatened marine and anadromous species.* (10-1-13 Edition).

[2] <u>Plaintiffs</u>:  In addition to the Alaska Oil and Gas Association ("AOGA"), the American Petroleum Institute ("API") is a plaintiff in 4:13-cv-00018.  In addition to the North Slope Borough ("NSB"), plaintiffs in 4:13-cv-00022 include the Arctic Slope Regional Corporation ("ASRC"), Northwest Arctic Borough ("NAB"), NANA Regional Corporation ("NANA"), and Inupiat Community of the Arctic Slope ("Inupiat Community") (collectively "Northern Alaska Plaintiffs").

<u>Defendants</u>:  In addition to the Secretary of Commerce, NMFS, and NOAA, defendants in 4:13-cv-00021 include Kathryn D. Sullivan, Acting NOAA Administrator and Samuel D. Rauch, Assistant NOAA Administrator (for convenience, unless the context clearly indicates otherwise, as used herein, "NMFS" refers to the federal defendants collectively). The Center for Biological Diversity, Inc. ("CBD") has appeared as an intervener defendant in the consolidated action.

## II.    PENDING MOTIONS

At **Docket 50** Plaintiffs AOGA/API have moved for summary judgment, which NMFS has opposed and cross-moved for summary judgment.[3] The Center for Biological Diversity ("CBD") has also opposed and cross-moved for summary judgment.[4] AOGA/API have replied and opposed the cross-motions.[5]

At **Docket 54** the Northern Alaska Plaintiffs have moved for summary judgment, which NMFS and CBD have opposed and cross-moved for summary judgment.[6] The Northern Alaska Plaintiffs have replied and opposed the cross-motions.[7]

At **Docket 55** the State of Alaska (hereinafter "State") has moved for summary judgment, which NMFS and CBD have opposed and cross-moved for summary judgment.[8] The State has replied and opposed the cross-motions.[9]

The Court being fully advised in the matter has determined that oral argument would not materially assist in resolving the issues presented. Accordingly, the requests for oral argument are **DENIED**.[10]

---

[3]  Docket 63.

[4]  Docket 64.

[5]  Docket 65.

[6]  Dockets 63 (NMFS); 64 (CBD).

[7]  Docket 66.

[8]  Dockets 63 (NMFS); 64 (CBD).

[9]  Docket 73.

[10]  D.Ak. LR 7.2(a)(3)[B].

III.    **JURISDICTION and VENUE**

Jurisdiction is vested in this Court under 28 U.S.C. §§ 1331, 2201-02, 16 U.S.C. § 1540(g), and 5 U.S.C. §§ 553, 702–06.  Venue is proper under 29 U.S.C. § 1391(e).

IV.    **STANDARD OF REVIEW/ISSUES PRESENTED**

Because the ESA does not supply a separate standard for review, this Court reviews claims under the standards of the Administrative Procedures Act ("APA").[11] The APA provides that an agency action must be upheld on judicial review unless it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."[12] As applied to the ESA, the Ninth Circuit recently held:

> As a reviewing court, we must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment. Although our inquiry must be thorough, the standard of review is highly deferential; the agency's decision is entitled to a presumption of regularity," and we may not substitute our judgment for that of the agency. Where the agency has relied on relevant evidence [such that] a reasonable mind might accept as adequate to support a conclusion, its decision is supported by substantial evidence. Even [i]f the evidence is susceptible of more than one rational interpretation, [the court] must uphold [the agency's] findings.
> Under the ESA, the agency must base its actions on evidence supported by the best scientific and commercial data available. The determination of what constitutes the *best* scientific data available belongs to the agency's special expertise . . .  When examining this kind of scientific determination, as opposed to simple findings of fact, a reviewing court must

---

[11]    *San Luis & Delta–Mendota Water Auth. v. Jewel*, 747 F.3d 581, 601 (9th Cir. 2014) (citing *Bennett v. Spear*, 520 U.S. 154, 174 (1997)); *Oregon Natural Desert Ass'n v. Bureau of Land Mgmnt.*, 625 F.3d 1092, 1109 (9th Cir. 2010); *Pyramid Lake Paiute Tribe of Indians v. United States Dept. of Navy*, 898 F.2d 1410, 1414 (9th Cir. 1990)).

[12]    5 U.S.C. § 706(2)(A).

generally be at its most deferential. Absent superior data[,] occasional imperfections do not violate the ESA best available standard.

The best *available* data requirement merely prohibits [an agency] from disregarding available scientific evidence that is in some way better than the evidence [it] relies on. Essentially, FWS cannot ignore available biological information. Thus, insufficient . . . [or] incomplete information . . . does not excuse [an agency's] failure to comply with the statutory requirement of a comprehensive biological opinion using the best information available where there was some additional superior information available. On the other hand, where the information is not readily available, we cannot insist on perfection: [T]he best scientific . . . data available, does not mean the best scientific data possible.[13]

The Ninth Circuit has made clear that a court's review of agency decisions under the APA is extremely narrow. Under § 706(2)(A), a court may set aside an agency action only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." When reviewing "under the arbitrary and capricious standard[,]" a court is deferential to the agency involved.[14] A court may not substitute its judgment for that of the agency:[15] as long as the agency states a rational connection between the facts found and the decision made it must be upheld.[16] This deference is particularly appropriate where the decision of the agency at issue "requires a high level of technical expertise."[17]

---

[13] *San Luis & Delta–Mendota Water Auth.*, 747 F.3d at 601–02 (internal citations and quotation marks omitted) (omissions and substitutions in the original).

[14] *Nat'l Ass'n of Homebuilders v. Defenders of Wildlife*, 551 U.S. 644, 658 (2007).

[15] *Citizens to Pres. Overton Park v. Volpe*, 401 U.S. 402, 416 (1971).

[16] *Home Builder's Ass'n of Northern Calif. v. United States Fish and Wildlife Svc.*, 616 F.3d 983, 988 (9th Cir. 2010) (quoting *Tucson Herpetological Soc'y v. Salazar*, 566 F.3d 870, 875 (9th Cir. 2009).

[17] *Marsh v. Oregon Natural Res. Council*, 490 U.S. 360, 375–77 (1989); *see Alaska Wilderness Recreation and Tourism Ass'n v. Morrison*, 67 F.3d 723, 727 (9th Cir. 1995).

This Court's review is limited to "the administrative record already in existence, not some new record made in the reviewing court."[18]

> If the record before the agency does not support the agency action, if the agency has not considered all relevant factors, or if the reviewing court simply cannot evaluate the challenged agency action on the basis of the record before it, the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation. The reviewing court is not generally empowered to conduct a *de novo* inquiry into the matter being reviewed and to reach its own conclusions based on such an inquiry . . .
>
> The factfinding capacity of the district court is thus typically unnecessary to judicial review of agency decisionmaking.[19]

Where, as here, the Court is reviewing an agency's interpretation of a statute, such as the ESA, the appropriate framework of review under *Chevron* is a two-step process: (1) first the court must look to the plain meaning of the statutory language, i.e., is it unambiguous; and (2) if ambiguous, whether the agency's interpretation of the statutory language is permissible.[20] In this case it is indisputable that the statute in question fails the "plain meaning" rule, it is ambiguous. "When it enacted the ESA, Congress delegated broad administrative and interpretive power to the Secretary [of Commerce]."[21] As the Ninth Circuit has found "[by] leaving an 'explicit gap' for agency promulgated regulations, the

---

[18]   *Camp v. Pitts*, 411 U.S. 138, 142 (1973).

[19]   *San Luis & Delta–Mendota Water Authority*, 747 F.3d at 602 (internal citations and quotation marks omitted).

[20]   *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842–43 (1984).

[21]   *Babbitt v. Sweet Home Chapter of Cmtys for Greater Oregon*, 515 U.S. 687, 708 (1995);  *see* 16 U.S.C. § 1533(c)(1), *see also* 50 C.F.R. § 402.01(b) (re-delegating that authority to NMFS).

ESA expressly delegates authority to the [agency] to decide how such listing determinations are to be made."[22] Thus, this Court examines the Listing Rule before it under *Chevron's* second step, i.e., whether the agency's interpretation is permissible.[23]

**Applying the foregoing standards, the ultimate issue presented in this appeal is whether or not the decision to list the Beringia and Okhotsk DPSs of the *Erignathus barbatus nauticus* subspecies of bearded seals as threatened under the ESA was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." For the reasons set forth below, the Court concludes that under the circumstances and given the lack of evidence upon which the listing was based, the decision to include the Beringia bearded seals as threatened was arbitrary, capricious and an abuse of discretion.**

## V. STANDING

NMFS contends that the Plaintiffs lack standing to challenge the listing of the Okhotsk DPS of the bearded seals, which is located in the Sea of Okhotsk off the coast of Japan and the Russian Federation. NMFS also challenges the standing of the Northern Alaska Plaintiffs in its entirety. Standing is a threshold question affecting the jurisdiction of this Court. Accordingly, it must be determined first.

---

[22] *Trout Unlimited v. Lohn*, 559 F.3d 946, 961 (9th Cir. 2009).

[23] An agency determination qualifies under the second-step of the *Chevron* rule when it meets two requirements: (1) "when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law," and (2) "the agency interpretation claiming deference was promulgated in the exercise of that authority." *United States v. Mead Corp.*, 533 U.S. 218, 226–27 (2001).

To bring an action under the APA, a party must have both constitutional and prudential standing.[24] To have standing under Article III, a plaintiff must show that it has: (1) "suffered an injury in fact," i.e. "an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical"; (2) with a causal connection between the act complained of and the injury; and (3) a reasonable likelihood that a favorable decision will redress the injury.[25] "For a plaintiff to have prudential standing under the APA, the interest to be sought to be protected by the complainant must be arguably within the zone of interests to be protected or regulated by the statute in question."[26]

In opposition AOGA/API do not contend that they have suffered any injury in fact as a result of the Listing Rule's inclusion of the Okhotsk DPS. Instead, AOGA/API argue that they are attacking the Listing Rule in its entirety and, because it is indivisible, it stands or falls in its entirety. In addition to advancing a similar argument, the State further contends that it has standing because it is "injured by NMFS's lack of disclosure . . . and lack of consideration or evaluation of relevant factors in the listing decision." The State also contends that "[a]s one of the wildlife management authorities in the circumpolar region, Alaska has a direct interest in seeing that NMFS complies with ESA § 4 as concerns

---

[24]    *Association of Data Processing Service Organizations v. Camp*, 307 U.S. 150, 151–52 (1970).

[25]    *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992) (internal quotation marks and citations omitted).

[26]    *National Credit Union Admin. v. First Nat'l Bank & Trust Co.*, 522 U.S. 479, 488 (1998) (internal quotation marks and alteration omitted).

species throughout the region, especially where other individuals of the same species (from Alaska's perspective) occur within Alaska." Finally, the State argues that "[t]he Okhotsk listing is counter to Alaska's policy concern's and plans, and it presents adverse precedent for other listing decisions based on factors of concern to Alaska."[27]

## A.   *Listing of the Okhotsk Segment*

First, this Court rejects the indivisibility argument. The Court agrees that the factors that Plaintiffs contend render the decision to list the Beringia DPS invalid *could* likewise render the decision to list the Okhotsk DPS invalid. But that is not the test: the test is whether or not the decision to list both segments could have been made separately as opposed to being inextricably intertwined. While the NMFS chose to list both in the same listing, Plaintiffs have not cited any rule, regulation, or decision that NMFS was required to do so. In short, the Court may sever the decision to list the Beringia segment from the decision to list the Okhotsk segment.[28]

---

[27]   Plaintiff State of Alaska's Reply Memorandum in Support of its Motion for Summary Judgment.  Docket 73 at 13–14.

[28]   The Court also disagrees with the supposition that, if the decision to list the Beringia DPS is unsupported by the evidence, then the listing of the Okhotsk DPS more likely than not suffers from the same infirmity.  The evidence differed as to both segments, which requires separate analyses.  In addition, the record reflects that NMFS initially proposed listing  the Okhotsk DPS, but not the Beringia DPS.  Moreover, in the absence of some party having a concrete and particularized interest, which is not apparent in this case, this Court need not reach that issue.  If it were to do so, the Court would be in effect entering an advisory opinion, which is specifically forbidden. *See Flast v. Cohen*, 392 U.S. 83, 95–97 (1968).

The Court also rejects the State's additional argument regarding its interest. Reduced to its essence, the State's argument is that it has an interest in ensuring that NMFS complies with the law. The fatal flaw in the State's position is that it would confer standing to challenge almost every decision made by a Federal agency. The generalized interest advanced by the State is insufficient to confer standing under the standard laid down in *Lujan*. The Court therefore concludes that Plaintiffs have not set forth suffcient evidence of standing as to the Okhotsk DPS of bearded seals.

Accordingly, the Court will address solely the listing of the Beringia DPS.

## B.    *Standing of Northern Alaska Plaintiffs*

NMFS contends that the Northern Alaska Plaintiffs have not asserted a sufficient "injury in fact" that is "concrete and particularized." Even if, as NMFS argues, the interest of the Northern Alaska Plaintiffs may be speculative and remote, other factors override the objection to their standing. It is indisputable that a listing as a threaten species has a chilling effect on the extent of the scope and nature of human interaction with that species. In this case, it is also indisputable that the Northern Alaska Plaintiffs have a historic cultural relationship with the Beringia DPS of seals, including subsistence. The Northern Alaska Plaintiffs certainly have at least as much of a direct interest in the Listing Rule as does CBD; the Court would err if it did not permit CBD to intervene on the side of NMFS.[29]

---

[29]    *See Center for Biological Diversity v. Kempthorne*, 588 F.3d 701, 707–08 (9th Cir. 2009).

Accordingly, the Court declines to dismiss the Northern Alaska Plaintiffs for lack of standing.

## VI. DISCUSSION

### A. *Listing Rule*

NMFS provided the following summary:

> **SUMMARY:** We, NMFS, issue a final determination to list the Beringia and Okhotsk distinct populations segments (DPSs) of the *Erignathus barbatus nauticus* subspecies of the bearded seal (*Erignathus barbatus*) as threatened under the Endangered Species Act (ESA). We will propose to designate critical habitat for the Beringia DPS in a future rulemaking. To assist us with this effort, we solicit information that may be relevant to the designation of critical habitat for the Beringia DPS. In light of public comments and upon further review, we are withdrawing the proposed ESA section 4(d) protective regulations for the Beringia and Okhotsk DPSs because we have determined that such regulations are not necessary or advisable for the conservation of the Beringia and Okhotsk DPSs at this time. Given their current population sizes, the long-term nature of the primary threat to these DPSs (habitat alteration stemming from climate change), and the existing protections under the Marine Mammal Protection Act, it is unlikely that the proposed protective regulations would provide appreciable conservation benefits.[30]

Plaintiffs challenge the following finding in the Listing Rule:

> We have reviewed the status of the bearded seal, fully considering the best scientific and commercial data available, including the status review report. We have reviewed threats to the Beringia DPS and the Okhotsk DPS, as well as other relevant factors, and considered conservation efforts and special designations for bearded seals by states and foreign nations. In consideration of all of the threats and potential threats to bearded seals identified above, the assessment of the risks posed by those threats, the possible cumulative impacts, and the uncertainty associated with all of these, we draw the following conclusions:

---

[30]  77 Fed. Reg. 76740.

*Beringia DPS*:  (1) The present population size of the Beringia DPS is uncertain, but is estimated to be about 155,000 individuals.  (2) It is highly likely that reductions will occur in both the extent and timing of sea ice in the range of the Beringia DPS within the foreseeable future, particularly in the Bering Sea. To adapt to this modified ice regime, bearded seals would likely have to shift their nursing, rearing, and molting areas to ice-covered seas north of the Bering Strait, where projections suggest there is potential for the ice edge to retreat to deep waters of the Arctic basin, forcing the seals to adapt to suboptimal conditions and exploit potentially unsuitable habitats, and likely compromising their reproduction and survival rates. (3) Available information indicates a moderate to high threat that reductions in spring and summer sea ice will result in spatial separation of sea ice resting areas from benthic feeding habitat. (4) Available information indicates a moderate to high threat of reductions in sea ice suitable for molting (i.e., areas with at least 15 percent ice concentration in May-June) and a moderate threat of reductions in sea ice suitable for pup maturation (i.e., areas with at least 25 percent ice concentration in April-May). (5) Within the foreseeable future, the risks to the persistence of the Beringia DPS appear to be moderate (abundance and diversity) to high (productivity and spatial structure). We have determined that the Beringia DPS is not in danger of extinction throughout all of its range, but it is likely to become so within the foreseeable future. Therefore, we are listing it as threatened.[31]

The ESA defines a threatened species as one that "is likely to become an endangered species within the foreseeable future through all or a significant portion of its range."[32]  With respect to this provision the Listing Rule stated in response to a comment suggesting that the listing was premature:

Whether a species is healthy at the time of listing or beginning to decline is not the deciding factor. The inquiry requires NMFS to consider the status of the species both in the present and through the foreseeable future. Having received a petition and subsequently having found that the petition presented substantial information indicating that listing bearded seals may be warranted (73 FR 51615; September 4, 2008), we are required to use the best scientific

---

[31]  77 Fed. Reg. 76748.

[32]  16 U.S.C. § 1532(20); 50 C.F.R. § 424.01(m) (10-1-12).

and commercial data available to determine whether bearded seals satisfy the definition of an endangered or threatened species because of any of the five factors identified under section 4(a)(1) of the ESA. These data were compiled in the status review report of the bearded seal (Cameron *et al.,* 2010) and summarized in the preamble to the proposed rule.

We agree that the Beringia and Okhotsk DPSs are moderately large population units, are widely distributed and genetically diverse, and are not presently in danger of extinction. However, these characteristics do not protect them from becoming at risk of extinction in the foreseeable future as a consequence of widespread habitat loss. Based on the best available scientific data, we have concluded that it is highly likely that sea ice will decrease substantially within the range of the Beringia DPS in the foreseeable future, particularly in the Bering Sea. To adapt to this modified sea ice regime, bearded seals would likely have to shift their nursing, rearing, and molting areas to ice-covered seas north of the Bering Strait, where projections suggest there is potential for the spring and summer ice edge to retreat to deep waters of the Arctic basin. The most significant threats to the Beringia DPS were identified by the BRT as decoupling of sea ice resting areas from benthic foraging areas, decreases in sea ice habitat suitable for molting and pup maturation, and decreases in prey density and/or availability due to changes in ocean temperature and ice cover, which were scored as of 'moderate' or 'moderate to high' significance (Table 7; Cameron *et al.,* 2010). The greatest threats to the persistence of bearded seals in the Okhotsk DPS were determined by the BRT to be decreases in sea ice habitat suitable for whelping, nursing, pup maturation, and molting. These threats, which were assessed by the BRT as of 'high significance,' are more severe in the range of the Okhotsk DPS than in the range of the Beringia DPS because of the likelihood that the Sea of Okhotsk will by the end of this century frequently be ice-free or nearly so during April–June, the crucial months for these life history events.

Data were not available to make statistically rigorous inferences about how these DPSs will respond to habitat loss over time. We note that we currently have no mechanism to detect even major changes in bearded seal population size (Taylor *et al.,* 2007). However, the BRT's assessment of the severity of the demographic risks posed to the persistence of each of bearded seals DPSs was formalized using a numerical scoring system. The risks to the persistence of the Beringia and Okhotsk DPSs within the foreseeable future were judged to be moderate to high, with consistently higher risk scores assigned to the Okhotsk DPS (Table 9; Cameron *et al.,* 2010). After considering these risks as well as the remaining factors from section 4(a)(1) of the ESA, we concluded that the Beringia and Okhotsk

DPSs are likely to become endangered within the foreseeable future (threatened), primarily due to the projected loss of sea ice habitat.[33]

## B. *Applicable Statutes*

Section 4(a)(1) of the ESA (16 U.S.C. § 1533(a)(1)) provides:

(a) **Generally**
    (1) The Secretary shall by regulation promulgated in accordance with subsection (b) of this section determine whether any species is an endangered species or a threatened species because of any of the following factors:
        (A) the present or threatened destruction, modification, or curtailment of its habitat or range;
        (B) overutilization for commercial, recreational, scientific, or educational purposes;
        (C) disease or predation;
        (D) the inadequacy of existing regulatory mechanisms; or
        (E) other natural or manmade factors affecting its continued existence.

It is evident that in this case that § 4(a)(1)(B), (C), and (D) are clearly inapplicable, leaving § 4(a)(1)(A) and (E).

Section 4(b)(1) of the ESA (16 U.S.C. § 1533(b)(1)) provides in relevant part:

(b) **Basis for determinations**
    (1)
        (A) The Secretary shall make determinations required by subsection (a)(1) of this section solely on the basis of the best scientific and commercial data available to him after conducting a review of the status of the species and after taking into account those efforts, if any, being made by any State or foreign nation, or any political subdivision of a State or foreign nation, to protect such species, whether by predator control, protection of habitat and food supply, or other conservation practices, within any area under its jurisdiction; or on the high seas.

---

[33]  77 Fed. Reg. 76758 (response to Comment 18).

(B) In carrying out this section, the Secretary shall give consideration to species which have been—

(I) designated as requiring protection from unrestricted commerce by any foreign nation, or pursuant to any international agreement; or

(ii) identified as in danger of extinction, or likely to become so within the foreseeable future, by any State agency or by any agency of a foreign nation that is responsible for the conservation of fish or wildlife or plants.

The regulations promulgated by the Secretary reiterate the provisions of ESA § 4(a)(1) and (b)(1).[34] It has been stated that "[t]he ultimate goal of the ESA is to recover listed species to the point where they no longer need ESA protection."[35] It is within this general framework that this Court must resolve the issue before it.

### C.    *Effect of Listing*

NMFS is authorized to issue such regulations as it may consider necessary and advisable for the preservation of a listed species.[36] The ESA further provides that concurrently with the listing as threatened or endangered, the Secretary "shall . . . designate any habitat of such species which is then considered to be critical habitat."[37] The listing of a species as threatened triggers several protective provisions.[38] The most recent

---

[34]  *See* 50 CFR § 424.11(b), (c) *Factors for listing, delisting, or reclassifying species* (10-1-12).

[35]   *Western Watersheds Project v. Ashe*, 948 F. Supp. 2d 1166, 1171 (D. Idaho 2013) (citing 16 U.S.C. §§ 1531(b)–(c), 1532(3)).

[36]   ESA § 4(d) [16 U.S.C. § 1533(d)].

[37]   ESA § 4(a)(3)(A) [16 U.S.C. § 1533(a)(3)(A)].

[38]  *See* 50 C.F.R. § 223.101(a) (10-1-12) (stating that the purpose and scope of the regulations is to provide for conservation of threatened species by establishing rules and (continued...)

edition of C.F.R. Part 223 (October 1, 2013) does not itself contain any provision generally or specifically regulating activities affecting the Beringia DPS. It does, however, note that the provisions therein "are in addition to, and not in lieu of, other regulations of parts 222 through 226 of this chapter which prescribe additional restrictions or conditions governing threatened species."[39] Of these, only Part 222, which applies to both threatened and endangered species,[40] applies to this case.[41] In this case, the only apparent provision that may be applicable is the general permitting procedures.[42] However, the regulations also specifically provide that a permit is required solely for threatened species to which the Secretary has applied the limitations of ESA § 9(a) [16 U.S.C. § 1538(a)] by regulation.[43]

Although it was initially proposed to apply ESA § 9(a) to the listing, in promulgating the Listing Rule NMFS determined that it was "not aware of any [information], indicating that the addition of the ESA § 9 prohibitions would apply to any activities that are currently unregulated and are having, or have the potential to have, significant effects on the

---

[38] (...continued)
procedures to govern activities involving them).

[39] 50 C.F.R. § 223.101(c) (10-1-2013).

[40] Governing "the taking, possession, transportation, sale, purchase, barter, exploration, importation of, and other requirements to wildlife . . . determined to be threatened or endangered pursuant to section 4(a) of the Act." 50 C.F.R. § 222.101(a) (10-1-2013).

[41] Part 224 applies to endangered specifies with no apparent application in this case. Part 225 is reserved. Part 226 designates critical habitat for various species, but does not designate any critical habitat for the Beringia DPS.

[42] 50 C.F.R. §§ 222.301, *et seq.*

[43] 50 C.F.R. § 222.301(b).

Beringia or Okhotsk DPS."[44] NMFS then concluded that, because § 9(a) prohibitions would not provide appreciable conservation benefits and they could be adopted in the future if necessary, it was unnecessary to adopt them at this time.[45] NMFS noted:

> Section 7(a)(2) of the ESA requires Federal agencies to consult with us to ensure that activities they authorize, fund, or conduct are not likely to jeopardize the continued existence of a listed species or a species proposed for listing, or to adversely modify critical habitat or proposed critical habitat. If a Federal action may affect a listed species or its critical habitat, the responsible Federal agency must enter into consultation with us. Examples of Federal actions that may affect the Beringia DPS of bearded seals include permits and authorizations relating to coastal development and habitat alteration, oil and gas development (including seismic exploration), toxic waste and other pollutant discharges, and cooperative agreements for subsistence harvest.[46]

**D.     *Analysis of Arguments***

Plaintiffs raise several alleged errors: (1) a failure to link its sea-ice projections to habitat changes, biological functions, and population changes; (2) improper use and application of the "foreseeable future" (specifically, a significant and allegedly unsupported change in the reliability of projecting 100 years into the future instead of 50); (3) failure to adequately respond to the State's comments; (4) uncertainty and lack of adequate information to support the listing, specifically the lack of available information/data to reasonably determine either an extinction threshold or whether such a threshold would be

---

[44]   77 Fed. Reg. 76749.

[45]   *Id.*

[46]   *Id.*;  *see* 77 Fed. Reg. 76765 (response to Comment 50).

reached; and (5) an unexplained change from the initial draft that did not list the Beringia DPS as threatened.

The Listing Rule also addressed changes in ocean conditions.

Ocean acidification is an ongoing process whereby chemical reactions occur that reduce both seawater pH and the concentration of carbonate ions when $CO_2$ is absorbed by seawater. Results from global ocean $CO_2$ surveys over the past two decades have shown that ocean acidification is a predictable consequence of rising atmospheric $CO_2$ levels. The process of ocean acidification has long been recognized, but the ecological implications of such chemical changes have only recently begun to be appreciated. The waters of the Arctic and adjacent seas are among the most vulnerable to ocean acidification. The most likely impact of ocean acidification on bearded seals will be through the loss of benthic calcifiers and lower trophic levels on which the species' prey depends. Cascading effects are likely both in the marine and freshwater environments. Our limited understanding of planktonic and benthic calcifiers in the Arctic (e.g., even their baseline geographical distributions) means that future changes will be difficult to detect and evaluate.

Warming of the oceans is predicted to drive species ranges toward higher latitudes. Additionally, climate change can strongly influence fish distribution and abundance. Further shifts in spatial distribution and northward range extensions appear to be inevitable, and the species composition of the plankton and fish communities will continue to change under a warming climate.

Bearded seals of different age classes are thought to feed at different trophic levels, so any ecosystem change could be expected to affect bearded seals in a variety of ways. Changes in bearded seal prey, anticipated in response to ocean warming and loss of sea ice and, potentially, ocean acidification, have the potential for negative impacts, but the possibilities are complex. These ecosystem responses may have very long lags as they propagate through trophic webs. Because of bearded seals' apparent dietary flexibility, these threats are of less concern than the direct effects of potential sea ice degradation.[47]

---

[47]  77 Fed. Reg. 76744–45.

After analyzing the effect of changes in ocean conditions the Listing Rule concluded:

> Bearded seals of different age classes are thought to feed at different trophic levels, so any ecosystem change could be expected to affect bearded seals in a variety of ways. Changes in bearded seal prey, anticipated in response to ocean warming and loss of sea ice and, potentially, ocean acidification, have the potential for negative impacts, but the possibilities are complex. These ecosystem responses may have very long lags as they propagate through trophic webs. Because of bearded seals' apparent dietary flexibility, these threats are of less concern than the direct effects of potential sea ice degradation. Bearded seals of different age classes are thought to feed at different trophic levels, so any ecosystem change could be expected to affect bearded seals in a variety of ways. Changes in bearded seal prey, anticipated in response to ocean warming and loss of sea ice and, potentially, ocean acidification, have the potential for negative impacts, but the possibilities are complex. These ecosystem responses may have very long lags as they propagate through trophic webs. Because of bearded seals' apparent dietary flexibility, these threats are of less concern than the direct effects of potential sea ice degradation.[48]

The Listing Rule also concluded that the potential threat to bearded seals from disease was low, and the adequacy of existing regulatory mechanisms was also included in the risk assessment.[49] With respect to pollution and contaminants, oil and gas industry, fisheries, and shipping the Listing Rule concluded: "We find that the threats posed by pollutants, oil and gas industry activities, fisheries, and shipping do not individually or collectively place the Beringia DPS or the Okhotsk DPS at risk of becoming endangered in the foreseeable future."[50] The analysis of demographic risks concluded:

---

[48]   77 Fed. Reg. 76745.

[49]   *Ibid.* It is noted that the only discussion of green-house gases was in connection with the Okhotsk segment.

[50]   77 Fed. Reg. 76747.

The degree of risk posed by the threats associated with the impacts of global climate change on bearded seal habitat is uncertain due to a lack of quantitative information linking environmental conditions to bearded seal vital rates, and a lack of information about how resilient bearded seals will be to these changes. The BRT considered the current risks (in terms of abundance, productivity, spatial structure, and diversity) to the persistence of the Beringia DPS and the Okhotsk DPS as low or very low. The BRT judged the risks to the persistence of the Beringia DPS within the foreseeable future to be moderate (abundance and diversity) to high (productivity and spatial structure), and to the Okhotsk DPS to be high for abundance, productivity, and spatial structure, and moderate for diversity.[51]

Although the Listing Rule discussed conservation efforts in general, it made neither findings nor drew conclusions from conservation efforts, internationally or domestically. The Court does note, however, that the tenor of the analysis in the Listing Rule was generally positive in noting ongoing monitoring of the bearded seal population by others.

The Listing Rule concluded:

*Beringia DPS:* (1) The present population size of the Beringia DPS is uncertain, but is estimated to be about 155,000 individuals. (2) It is highly likely that reductions will occur in both the extent and timing of sea ice in the range of the Beringia DPS within the foreseeable future, particularly in the Bering Sea. To adapt to this modified ice regime, bearded seals would likely have to shift their nursing, rearing, and molting areas to ice-covered seas north of the Bering Strait, where projections suggest there is potential for the ice edge to retreat to deep waters of the Arctic basin, forcing the seals to adapt to suboptimal conditions and exploit potentially unsuitable habitats, and likely compromising their reproduction and survival rates. (3) Available information indicates a moderate to high threat that reductions in spring and summer sea ice will result in spatial separation of sea ice resting areas from benthic feeding habitat. (4) Available information indicates a moderate to high threat of reductions in sea ice suitable for molting (i.e., areas with at least 15 percent ice concentration in May-June) and a moderate threat of reductions in sea ice suitable for pup maturation (i.e., areas with at least 25 percent ice concentration in April-May). (5) Within the foreseeable future, the

---

[51]  77 Fed. Reg. 76747–48.

risks to the persistence of the Beringia DPS appear to be moderate (abundance and diversity) to high (productivity and spatial structure). We have determined that the Beringia DPS is not in danger of extinction throughout all of its range, but it is likely to become so within the foreseeable future. Therefore, we are listing it as threatened.[52]

The parties agree that the Listing Rule relied principally, if not solely, upon climate change as the governing factor for listing the Beringia DPS as threatened.[53] It is also undisputed that, under the regulations, climate change is not only a factor properly considered, but that a listing may be made on any one of the factors alone.[54] It is further undisputed that the term "foreseeable future" is not defined by either statute or regulation; accordingly, the agency defines it on a case-by-case basis in each listing decision.[55] With that general background, the Court will address the issues raised: first the procedural issues, then the substantive issues.

## 1.    Procedural Issues

Initially, the Court rejects Plaintiffs' argument that NMFS impermissibly added the Beringia DPS after the initial publication of a proposed rule. It is undisputed that the Plaintiffs had adequate and timely notice of the intent to include the Beringia DPS. Indeed, the record is clear that Plaintiffs vigorously opposed that listing. Consequently, Plaintiffs

---

[52]  77 Fed. Reg. 76748.

[53]  *See* 77 Fed. Reg. 76741.

[54]  50 C.F.R. § 424.11(c) (10-1-12).

[55]   *See In re Polar Bear Endangered Species Act Listing and Section 4(d) Rule Litigation – MDL No. 1993*, 709 F.3d 1, 15 (D.C. Cir.), *cert. denied sub nom. Safari Club Int'l. v. Jewell*, 134 S. Ct. 310 (2013).

not only cannot claim any prejudice by that action, but they cite no authority that a species cannot be added to, or removed from, a proposed listing during the rule making process. Nor, for that matter, has independent research by the Court discovered any such authority.

The State contends that NMFS failed to adequately respond to the State's comments. Section 4(I) of the EPA [16 U.S.C. § 1533(I)] provides in relevant part that where, as here, a State has filed comments disagreeing with the proposed regulation, "the Secretary shall submit to the State agency a written justification for his failure to adopt regulations consistent with the agency's comment or petition."[56]

NMFS argues that it responded to each of the State's comments in either its direct response to the State's comments or in the Listing Rule itself. As the State notes, in rejecting the argument that responding in the listing rule was sufficient, this Court itself recently held:

> First, it is clear from the fact that Congress established a *separate procedure* to respond to state agency comments, as opposed to comments from other affected parties, that Congress envisioned a *separate duty* on the part of the Service to specifically respond to those state comments not adopted in a final rule. Indeed, the statute clearly requires that *after* a final rule is issued, the Service must provide a *separate* written justification to the state agency responsible for the comments not used in the final rule. Thus, the Service's statement that adequate responses to the State's unused comments could be found *in part in the Final Rule itself* is directly contrary to ESA procedure. By not including in the response letter *all* its responses to the State's comments not ultimately included in the Final Rule, the Service did not fulfill its response obligations under the ESA.[57]

---

[56]  *See* 50 C.F.R. § 424.18(c) (10-1-12) (containing identical language).

[57]  *Alaska Oil and Gas Ass'n v. Salazar*, 916 F. Supp.2d 974, 1003 (D. Alaska 2013) (continued...)

NMFS has not cited any controlling authority that this Court's earlier decision is erroneous, nor has it advanced any compelling argument that the Court should reverse itself. Accordingly, this Court holds that it does not appear that NMFS adequately responded to the State's comments.

## 2. Substantive Issues

Plaintiffs' substantive issues can be conflated into two: (1) uncertainty and lack of information to support the listing, including failure to link its sea-ice projections to habitat changes, biological functions, and population changes; and (2) improper use of a 100-year projection into the future.

Plaintiffs contend that there is a lack of data to link projected habitat declines to bearded seal biological response and the ultimate projected population trends. The Listing Rule identified five main functions of sea-ice with respect to bearded seals.

> An assessment of the risks to bearded seals posed by climate change must consider the species' life-history functions, how they are linked with sea ice, and how altering that link will affect the vital rates of reproduction and survival. The main functions of sea ice relating to the species' life-history are: (1) A dry and stable platform for whelping and nursing of pups in April and May (Kovacs *et al.,* 1996; Atkinson, 1997); (2) a rearing habitat that allows mothers to feed and replenish energy reserves lost while nursing; (3) a habitat that allows a pup to gain experience diving, swimming, and hunting with its mother, and that provides a platform for resting, relatively isolated from most terrestrial and marine predators; (4) a habitat for rutting males to

---

[57] (...continued)
(emphasis in the original) (footnotes omitted).

hold territories and attract post-lactating females; and (5) a platform suitable for extended periods of hauling out during molting.[58]

NMFS then discussed in general terms the effect of these five factors on the bearded seal population.[59]

With respect to the predictions of the effect of changes in sea-ice on the Beringia DPS, the Listing Rule found:

> *Beringia DPS*:  In the Bering Sea, early springtime sea ice habitat for bearded seal whelping should be sufficient in most years through 2050 and out to the second half of the 21st century, when the average ice extent in April is forecasted to be approximately 50 percent of the present-day extent. The general trend in projections of sea ice for May (nursing, rearing, and some molting) through June (molting) in the Bering Sea is toward a longer ice-free period resulting from more rapid spring melt. Until at least the middle of the 21st century, projections show some years with near-maximum ice extent; however, less ice is forecasted on average, manifested as more frequent years in which the spring retreat occurs earlier and the peak ice extent is lower. By the end of the 21st century, projections for the Bering Sea indicate that there will commonly be years with little or no ice in May, and that sea ice in June is expected to be non-existent in most years.
> Projections of sea ice concentration indicate that there will typically be 25 percent or greater ice concentration in April–May over a substantial portion of the shelf zone in the Bering Sea through 2055. By 2095 ice concentrations of 25 percent or greater are projected for May only in small zones of the Gulf of Anadyr and in the area between St. Lawrence Island and Bering Strait. In the minimal ice years the projections indicate there will be little or no ice of 25 percent or greater concentration over the shelf zone in the Bering Sea during April and May, perhaps commencing as early as the next decade. Conditions will be particularly poor for the molt in June when typical ice predictions suggest less than 15 percent ice by mid-century. Projections suggest that the spring and summer ice edge could retreat to deep waters of the Arctic Ocean basin, potentially separating sea ice suitable for pup maturation and molting from benthic feeding areas.

---

[58]   77 Fed. Reg. 76742.

[59]   77 Fed. Reg. 76742–43.

In the East Siberian, Chukchi, and Beaufort seas, the average ice extents during April and May (i.e., the period of whelping, nursing, mating, and some molting) are all predicted to be very close to historical averages out to the end of the 21st century. However, the annual variability of this extent is forecasted to continue to increase, and single model runs indicate the possibility of a few years in which April and May sea ice would cover only half (or in the case of the Chukchi Sea, none) of the Arctic shelf in these regions by the end of the century. The projections indicate that there will typically be 25 percent or greater ice concentration in April–June over the entire shelf zones in the Beaufort, Chukchi, and East Siberian Seas through the end of the century. In the minimal ice years 25 percent or greater ice concentration is projected over the shelf zones in April and May in these regions through the end of the century, except in the eastern Chukchi and central Beaufort Seas. In the 2090s, ice suitable for molting in June (i.e., 15 percent or more concentration) is projected to be mostly absent in these regions in minimal years, except in the western Chukchi Sea and northern East Siberian Sea.

A reduction in spring and summer sea ice concentrations could conceivably result in the development of new areas containing suitable habitat or enhancement of existing suboptimal habitat. For example, the East Siberian Sea has been said to be relatively low in bearded seal numbers and has historically had very high ice concentrations and long seasonal ice coverage. Ice concentrations projected for May–June near the end of the century in this region include substantial areas with 20–80 percent ice, potentially suitable for bearded seal reproduction, molting, and foraging. However, the net difference between sea ice related habitat creation and loss is likely to be negative, especially because other factors like ocean warming and acidification (discussed below) are likely to affect habitat.

A substantial portion (about 70 percent) of the Beringia DPS currently whelps in the Bering Sea, where a longer ice-free period is forecasted in May and June. To adapt to this modified sea ice regime, bearded seals would likely have to shift their nursing, rearing, and molting areas to the ice covered seas north of the Bering Strait, potentially with poor access to food, or to coastal haul-out sites on shore, potentially with increased risks of disturbance, predation, and competition. Both of these scenarios would require bearded seals to adapt to novel (i.e., suboptimal) conditions, and to exploit habitats to which they may not be well suited, likely compromising their reproduction and survival rates. Further, the spring and summer ice edge may retreat to deep waters of the Arctic Ocean basin, which could separate sea ice suitable for pup maturation and molting from benthic feeding areas. Accordingly, we conclude that the projected changes in sea

ice habitat pose significant threats to the persistence of the Beringia DPS throughout all of its range.[60]

NMFS addressed the use of the 100-year projection.

*Comment 5:* A peer reviewer and several public comments pointed out that assessing impacts to bearded seals from climate change through the end of this century is inconsistent with: (1) Other recent ESA determinations for Arctic species, such as ribbon seal and polar bear, that considered species responses through mid-century; and (2) IUCN red list process, which uses a timeframe of three generation lengths. Related public comments, including from the State of Alaska, noted that NMFS's recent ESA listing determination for the ribbon seal and a subsequent court decision concluded that projections of climate scenarios beyond 2050 are too heavily dependent on socioeconomic assumptions and are therefore too divergent for reliable use in assessing threats to the species. A reviewer and some commenters expressed the opinion that trying to predict the responses of bearded seals to environmental changes beyond midcentury increases the uncertainty unreasonably. A few commenters suggested that the altered approach is significant because the listing determination is wholly dependent upon NMFS's use of a 100-year foreseeable future. Several commenters expressed the opinion that inadequate justification was provided for NMFS's use of a 100-year foreseeable future. Many of these commenters suggested that the best scientific data support a "foreseeable future" time frame of no more than 50 years, and some commenters such as the State of Alaska suggested a shorter time horizon of no more than 20 years. In contrast, another peer reviewer and some commenters expressed support for use of climate model projections through the end of the 21st century.

*Response:* The ESA requires us to make a decision as to whether the species under consideration is in danger of extinction throughout all or a significant portion of its range (endangered), or is likely to become endangered within the foreseeable future throughout all or a significant portion of its range (threatened) based on the best scientific and commercial data available. While we may consider the assessment processes of other scientists (i.e., IUCN), we must make a determination as to whether a species meets the definition of threatened or endangered based upon an assessment of the threats according to section 4 of the ESA. We have done so in this rule, using a threat-specific approach to the "foreseeable future" as discussed below and in the proposed listing rule.

---

[60]  77 Fed. Reg. 76743–44.

In the December 30, 2008, ribbon seal listing decision (73 FR 79822) the horizon of the foreseeable future was determined to be the year 2050. The reasons for limiting the review to 2050 included the difficulty in incorporating the increased divergence and uncertainty in future emissions scenarios beyond this time, as well as the lack of data for threats other than those related to climate change beyond 2050, and that the uncertainty inherent in assessing ribbon seal responses to threats increased as the analysis extended farther into the future. By contrast, in our more recent analyses for spotted, ringed, and bearded seals, we did not identify a single specific time as the foreseeable future. Rather, we addressed the foreseeable future based on the available data for each respective threat. This approach better reflects real conditions in that some threats (e.g., disease outbreaks) appear more randomly through time and are therefore difficult to predict, whereas other threats (climate change) evince documented trends supported by paleoclimatic data from which reasonably accurate predictions can be made farther into the future. Thus, the time period covered for what is reasonably foreseeable for one threat may not be the same for another. The approach is also consistent with the memorandum issued by the Department of the Interior, Office of the Solicitor, regarding the meaning of foreseeable future (Opinion M–37021; January 16, 2009). In consideration of this modified threat-specific approach, NMFS initiated a new status review of the ribbon seal on December 13, 2011 (76 FR 77467).

As discussed in the proposed listing rule, the analysis and synthesis of information presented in the IPCC's AR4 represents the scientific consensus view on the causes and future of climate change. The IPCC's AR4 used state-of-the-art atmosphere-ocean general circulation models (AOGCMs) under six "marker" scenarios from the SRES (IPCC, 2000) to develop climate projections under clearly stated assumptions about socioeconomic factors that could influence the emissions. Conditional on each scenario, the best estimate and likely range of emissions were projected through the end of the 21st century. In our review of the status of the bearded seal, we considered model projections of sea ice developed using the A1B scenario, a medium "business-as-usual" emissions scenario, as well the A2 scenario, a high emissions scenario, to represent a significant range of variability in future emissions.

We also note that the SRES scenarios do not assume implementation of additional climate initiatives beyond current mitigation policies. This is consistent with consideration of "existing" regulatory mechanisms in our analysis under ESA listing Factor D. It is also consistent with our Policy on Evaluating Conservation Efforts (68 FR 15100; March 28, 2003), which requires that in making listing decisions we consider only formalized

conservation efforts that are sufficiently certain to be implemented and effective.

The model projections of global warming (defined as the expected global change in surface air temperature) out to about 2040–2050 are primarily due to emissions that have already occurred and those that will occur over the next decade. Thus conditions projected to mid-century are less sensitive to assumed future emissions scenarios. For the second half of the 21st century, however, the choice of an emissions scenario becomes the major source of variation among climate projections. As noted above, in our 2008 listing decision for ribbon seal, the foreseeable future was determined to be the year 2050. The identification of mid-century as the foreseeable future took into consideration the approach taken by the FWS in conducting its status review of the polar bear under the ESA, and the IPCC assertion that GHG levels are expected to increase in a manner that is largely independent of assumed emissions scenarios until about the middle of the 21st century, after which the emissions scenarios become increasingly influential.

Subsequently, in the listing analyses for spotted, ringed, and bearded seals, we noted that although projections of GHGs become increasingly uncertain and subject to assumed emissions scenarios in the latter half of the 21st century, projections of air temperatures consistently indicate that warming will continue throughout the century. Although the magnitude of the warming depends somewhat on the assumed emissions scenario, the trend is clear and unidirectional. To the extent that the IPCC model suite represents a consensus view, there is relatively little uncertainty that warming will continue. Because sea ice production and persistence is related to air temperature through well-known physical processes, the expectation is also that loss of sea ice and reduced snow cover will continue throughout the 21st century. Thus, the more recent inclusion of projections out to the year 2100 reflects NMFS's intention to use the best and most current data and analytical approaches available. AOGCM projections consistently show continued reductions in ice extent and multi-year ice (ice that has survived at least one summer melt season) throughout the 21st century (e.g., Holland *et al.,* 2006; Zhang and Walsh, 2006; Overland and Wang, 2007), albeit with a spread among the models in the projected reductions. In addition, as discussed by Douglas (2010), the observed rate of Arctic sea ice loss has been reported as greater than the collective projections of most IPCC-recognized AOGCMs (e.g., Stroeve *et al.,* 2007; Wang and Overland, 2009), suggesting that the projections of sea ice declines within this century may in fact be conservative.

We concluded that in this review of the status of the bearded seal, the climate projections in the IPCC's AR4, as well as the scientific papers used

in this report or resulting from this report, represent the best scientific and commercial data available to inform our assessment of the potential impacts from climate change. In our risk assessment for bearded seals, we therefore considered the full 21st century projections to analyze the threats stemming from climate change. We continue to recognize that the farther into the future the analysis extends, the greater the inherent uncertainty, and we incorporated that consideration into our assessments of the threats and the species' responses to the threats.[61]

NMFS acknowledged that it lacks sufficient data on the resilience of bearded seals to cope with climatic changes;[62] or to define an extinction threshold for bearded seals and assessing the probability of reaching that threshold within a specified time;[63] and that, because the existing body of information regarding bearded seal population and trends was limited, additional studies were needed to understand the population dynamics and habitat of the bearded seal.[64]

As noted above, what constitutes the "foreseeable future" is determined by the agency on a case-by-case basis. Reduced to its essence, the argument advanced by Plaintiffs is that NMFS should not have considered the effect on the Beringia DPS beyond 50 years. The Court has reviewed the authorities cited by the Plaintiffs and finds them

---

[61] 77 Fed. Reg. 76752–54.

[62] 77 Fed. Reg. 76755 (responses to Comments 8 and 9).

[63] 77 Fed. Reg. 76757 (response to Comment 16).

[64] 77 Fed. Reg. 76759 (response to Comment 19); *see also* 77 Fed. Reg. 76760 (response to Comment 27) (conceding that a more thorough assessment of seal habitat and population response to the climatic changes was needed before the threat of extinction could be assessed with any level of certainty)).

either inapposite or not controlling on the issue.[65]  Likewise, this Court finds that the recent

polar bear case decided by the D.C. Circuit relied upon by NMFS is also inapposite.  In that

case, although the Fish and Wildlife Service reviewed models projecting climate and ice

changes over periods of 45, 75 and 100 years,[66] the challenged listing was based upon a

45-year period, which the District Court specifically found was not too long.[67]  Independent

research by the Court has not revealed any case in which a listing of threatened was based

upon a time period that exceeded 50 years. Thus, in that respect this Court is writing on

a clean slate.

**Troubling to this Court is that it does not appear from the Listing Rule that any**

**serious threat of a reduction in the population of the Beringia DPS, let alone**

**extinction, exists prior to the end of the 21st century.  Indeed, the Listing Rule itself**

**concedes that, at least through mid-21st century, there will be sufficient sea-ice to**

**sustain the Beringia DPS at or near its current population levels.**[68] Indeed,  with

respect to the second half of the century it appears that no significant threat to the Beringia

DPS is contemplated before 2090.  Even as to that date, NMFS acknowledges that it lacks

---

[65]  In each of the cases cited the relevant time-period considered by the agency in making the listing was less than 50 years. Although it is plausible to interpret those cases as not precluding a longer period, they cannot be plausibly construed as necessarily permitting it. The precise issue was simply not before any court.

[66]  *In re Polar Bear Endangered Species Act Listing and Section 4(d) Rule Litigation*, 794 F. Supp.2d 65, 75–76, 94–95 (D. D.C. 2011), *aff'd* 709 F.3d 1 (D.C. Cir.), *cert. denied sub nom. Safari Club Int'l. v. Jewell*, 134 S. Ct. 310 (2013).

[67]  *Id.* at 75.

[68]  77 Fed. Reg. 76743–44.

any reliable data as to the actual impact on the bearded seal population as a result of the loss of sea-ice.  Under the facts in this case, forecasting more than 50 years into the future is simply too speculative and remote to support a determination that the bearded seal is in danger of becoming extinct.[69]

## VII.  CONCLUSION AND ORDER

After reviewing the voluminous record and applicable case law/, the Court has determined that the action of NMFS in listing the Beringia DPS of bearded seals was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."[70] In particular, with respect to two factors: (1) the lack of any articulated discernable, quantified threat of extinction within the *reasonably* foreseeable future; and (2) the express finding that, because existing protections were adequate, no further protective action need be taken at this time. Listing the Beringia DPS as "endangered" had no effect except to require all federal agencies to consult with NMFS before carrying out any action that might jeopardize the continued existence of the Beringia DPS throughout its range. A listing under the ESA based upon speculation, that provides no additional action intended to

---

[69]  This Court is *not* holding that the use of projections that extend out more than 50 years is impermissible in all cases. The Court's holding today is limited to the facts presented in the record before it, i.e., that an unknown, unquantifiable population reduction, which is not expected to occur until nearly 100 years in the future, is too remote and speculative to support a listing as threatened. If it were to hold otherwise, such a holding could logically render every species in the arctic and sub-arctic areas potentially "threatened."

[70]  5 U.S.C. § 706(2)(A).

preserve the continued existence of the listed species, is inherently arbitrary and capricious.

Where, as here, the agency's action is found to be arbitrary and capricious, the appropriate action is to remand to the agency.[71] "[V]acatur of an unlawful agency rule normally accompanies a remand."[72]

Therefore, Plaintiffs' Motions for Summary Judgment at **Dockets 50, 54, and 55** are hereby **GRANTED**. The final rule shall be **VACATED** to the extent it affects the Beringia bearded seal DPS and **REMANDED** to NMFS to correct the aforementioned substantive and procedural deficiencies.

The Clerk of the Court is directed to enter final judgment accordingly.

**IT IS SO ORDERED** this 25th day of July, 2014.

S/ RALPH R. BEISTLINE
UNITED STATES DISTRICT JUDGE

---

[71] *Nat'l Ass'n of Homebuilders*, 551 U.S. at 657–58.

[72] *Alsea Valley Alliance v. Dep't of Commerce*, 358 F.3d 1181, 1185–86 (9th Cir. 2004).